**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| C.F.C.S. INVESTMENTS, LP, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 4:16-CV-00396 JAR |
| | ) | |
| TRANSAMERICA OCCIDENTAL LIFE | ) | |
| INSURANCE COMPANY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on the following motions: Transamerica Life Insurance Company's Motion for Summary Judgment or, in the alternative, Partial Summary Judgment (Doc. No. 91); Transamerica Life Insurance Company's Motion to Disqualify or, in the alternative, to Bar Opinions of Plaintiff's Proffered Expert (Doc. No. 97); Plaintiff C.F.C.S. Investments, LP's Motion for Summary Judgment on Count II of Plaintiff's Second Amended Complaint (Doc. No. 101); Plaintiff C.F.C.S. Investments, LP's Motions to Strike and Exclude Expert Testimony of Gregory Doby (Doc. No. 104) and Burke Christensen (Doc. No. 107); Defendant MAFG Services, Inc.'s Motion for Summary Judgment or, in the alternative, Partial Summary Judgment (Doc. No. 109); and Defendant MAFG Services, Inc.'s Motion to Bar Testimony and Opinions of Plaintiffs' Proffered Expert Stephen C. Burgess (Doc. No. 112). The motions are fully briefed and ready for disposition.[1]

### I.    Background

Plaintiffs C.F.C.S. Investments, LP ("CFCS") and Jewell A. Clark ("Clark") filed this

---

[1] MAFG has also requested oral argument on its motion for summary judgment. Finding that oral argument would not assist the Court, the request is **DENIED**.

action against Defendants Transamerica Life Insurance Company ("Transamerica") and MAFG Services, Inc. ("MAFG"), alleging wrongful termination of a $2 million life insurance policy, Policy No. 92543172 ("the Policy"), issued to CFCS by Transamerica in April 1997. The Policy required annual premium payments and provided a 31-day grace period if an annual premium payment was not timely paid. The Policy also had a procedure for reinstatement of a lapsed policy, so long as reinstatement was requested in writing within five years after the date of lapse. CFCS timely paid the annual premiums on the Policy through 2010, totaling approximately $487,000.00.

Plaintiffs allege that in August 2011, Transamerica informed CFCS that the Policy had lapsed and then denied CFCS's attempts to reinstate the Policy. According to Plaintiffs, Transamerica and MAFG failed to send notices regarding the Policy's grace period and subsequent lapse to the correct address for CFCS, failed to investigate the correct address, and failed to reinstate the Policy. In Counts I and III of the operative complaint, Plaintiffs assert claims for negligence against Transamerica and MAFG. As part of those claims, Plaintiffs allege that Transamerica and MAFG breached their fiduciary duties to Plaintiffs. In Count II, Plaintiffs seek damages against Transamerica for breach of contract, and in Count IV, Plaintiffs request a judgment against Transamerica declaring that the Policy did not lapse and remains in full force and effect, and that the benefit is due and owing following Jewell Clark's death.

CFCS moves for summary judgment on its breach of contract claim on the grounds that Transamerica breached its contractual duty to notify CFCS of the grace period and lapse by failing to send notice to CFCS's correct address or by failing to determine and send notice to CFCS's correct address. Transamerica moves for summary judgment on the grounds that it had no duty to investigate a new address for CFCS or Clark or to attempt to locate either of them.

Likewise, MAFG moves for summary judgment on the grounds that as an insurance broker, its duty is limited to procurement. Thus, it was under no duty to CFCS when the Policy lapsed in 2011.

## II.  Legal Standard

Summary judgment is appropriate when no genuine issue of material fact exists in the case and the movant is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). The initial burden is placed on the moving party. City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988). If the record demonstrates that no genuine issue of fact is in dispute, the burden then shifts to the non-moving party, who must set forth affirmative evidence and specific facts showing a genuine dispute on that issue. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In determining whether summary judgment is appropriate in a particular case, the evidence must be viewed in the light most favorable to the nonmoving party. Osborn v. E.F. Hutton & Co., Inc., 853 F.2d 616, 619 (8th Cir. 1988). When both parties move for summary judgment, the Court must analyze each motion individually and on its own merits. Wermager v. Cormorant Township Bd., 716 F.2d 1211, 1214 (8th Cir. 1983).

## III.  Facts[2]

CFCS is a family-owned partnership founded by Harold Clark in 1996 as part of his estate plan. In furtherance of that plan, insurance broker MAFG procured a Transamerica universal life insurance policy, Policy No. 92543712 (the "Policy"), on the life of Harold Clark's wife, Jewell Clark. The Policy was issued by Transamerica on April 17, 1997, with a $2 million

---

[2] The facts are taken from Transamerica's Statement of Uncontroverted Facts (Doc. No. 93); CFCS's Statement of Uncontroverted Material Facts in Support of Motion for Summary Judgment on Count II of its Second Amended Complaint (Doc. No. 103), and MAFG's Statement of Uncontroverted Facts (Doc. No. 111), and are undisputed unless otherwise stated.

death benefit, which was intended to cover estimated estate taxes. CFCS was the owner and sole

beneficiary of the Policy; Jewell Clark was the insured.

With respect to payment of premiums, the Policy provided:

> You[3] must pay the Required Premium Per Year for the first 10 policy years. These premiums may be paid cumulatively in advance. At the end of each of the first 10 policy years, we will calculate the cumulative total of all premiums paid, less any Partial Surrenders and Surrender-Penalty-Free Withdrawals. We will divide this total by the number of years since the policy date. This amount must equal or exceed the Required Premium Per Year for each year in the required premium period or your policy will enter the Grace Period . . . If your policy enters the Grace Period . . . and there is any net cash value remaining at the end of the Grace Period, we will apply it to the Nonforfeiture Option . . . If there is no net cash value remaining at the end of the Grace Period, your policy will lapse.[4]

In the event an annual premium payment was not timely made, the Policy provided for a

"Grace Period":

> A Grace Period is a period of 31 days after (a) a monthly date when the accumulation value minus any existing loan is less than the monthly deduction due, or (b) a policy anniversary on which the cumulative Required Premium Per Year has not been paid during the first 10 policy years. (See Payment of Premiums provision number 2 on page 9.) **We will notify you that the Grace Period has begun** and that you must pay a premium large enough to keep the policy in force before the 31 days are up. If you do not pay enough premiums, and there is no net cash value, your policy will lapse. If there is any net cash value remaining at the end of the Grace Period, we will apply it to the Nonforfeiture Option. (See Nonforfeiture Option provision on page 17.)

> Since a monthly deduction is made on each monthly date for the prior month, and a nominal 31-day grace period is provided after that monthly date, there will always be at least a 62-day effective grace period for payment of overdue premiums.

(Emphasis added.)

The Policy further provided that "[Transamerica] will send any notice under the provisions of

this policy to your last known address and to any assignee of the policy." On CFCS's Application

for the Policy, under "Special Information for Premium Notices," the billing address was listed

---

[3] **You and your** means the Owner of the Policy. (Doc. No. 103-1 at 12)

[4] **Lapse** means termination of the policy at the end of the Grace Period due to insufficient premium or accumulation value. (Id.)

as: 5391 Brown Ave., St. Louis, MO 63120 (the "Brown Address").

From the time the Policy was issued through October 2010, CFCS paid $460,715.75 in premiums to Transamerica. Over this period of time, MAFG earned approximately $60,000 in commissions from Transamerica for each premium payment made by CFCS. MAFG asserts there was no contact or communications between itself and CFCS after the Policy was delivered in 1997 and prior to its lapse in 2011. CFCS disputes this, arguing there may have been some communications during this time period but that according to MAFG's corporate representative, some of its records "would have been lost in the transition" from MAFG's affiliation with First Union back solely to MAFG.

CFCS did not have any customary operations or employees or its own office or telephone number. CFCS shared the Brown Address with Clark Properties, a separate property management company managed by Harold Clark's son, Michael Clark. During the relevant time, employees of Clark Properties performed services for CFCS, including paying the Policy premiums.

In 2009, CFCS moved to 3901 Union Boulevard, Suite 104A. (the "Union Address"). Through October of 2010, Transamerica continued to send quarterly premium due notices to the Brown Address. These notices were not returned as undeliverable and CFCS made at least three premium payments in 2010.

Transamerica's premium due notices and premium reminder notices stated on the front side, in the portion of the notice to be detached and returned to Transamerica:

**[ ] For change of address check box, print new address on back.**

The back side of the premium due and reminder notices provided a form on which to write in change of address information that stated:

**If the address to which billing notices should be sent has changed, please fill in the correct address below.**

**List all your Transamerica policy numbers for which an address change should be made.**

This change of address form included lines for the policy owner's name and address "for changes of address only" and a place for "policy number(s)" to which the address change should apply.

There is no record of CFCS reporting a change of address to Transamerica on the form provided on the premium notices. However, CFCS asserts that "correspondence with" Transamerica dated May 19, 2010 and July 13, 2010 "included its new Union Boulevard return address." Transamerica maintains that the only communications between the parties on those dates are copies of checks for premium payments with the following address in the upper left hand corner of the check:

CFCS Investments, L.P. c/o HLC Properties
3901 Union Blvd., Ste. 104A
St. Louis, MO 63135

According to Transamerica, it does not receive copies of checks sent by policy owners for payment of premiums in the normal course of business. Instead, checks are sent to a lockbox, processed by its bank and then deposited into Transamerica's account. Transamerica's insurance expert Burke Christensen[5] opines it is standard in the insurance industry that sending a check in payment of the premium is insufficient to give notice of a change in the policy owner's address and that the address on the checks did not constitute notice to Transamerica of CFCS's change of address.

---

[5] The parties' designated experts are all subjects of Daubert motions to exclude their testimony and opinions, which motions are addressed below.

CFCS also asserts that Linda Hedger, a Clark Properties employee, called Transamerica in 2010 to inform Transamerica of CFCS's address change. Hedger testified on deposition she was unsure whether her call to Transamerica occurred in 2010 or 2011, although she had a premium notice from 2010 with notations on it of the names of the people she claims to have spoken with. Transamerica has no record of any calls regarding CFCS's change of address prior to October 27, 2011, after the Policy had lapsed.

There is also no record of CFCS notifying MAFG that its mailing address had changed or asking MAFG to update its address with Transamerica.

On or about December 23, 2010, Transamerica sent a Notice of Premium Due to CFCS at the Brown Address advising that the premium was due on January 17, 2011. The notice was returned as undeliverable. Transamerica's corporate representative testified that pursuant to its Address Unknown guidelines, if mail is returned as undeliverable, Transamerica would attempt to locate an updated address by running a LexisNexis Accurint search. If the Accurint search located a "new address," then Transamerica would "update the address," "remove Address Unknown indication" in the system, and "resend the mail (including lapse notices) to the new address."

According to its corporate representative, Transamerica was unable to determine from its database searches[6] a current address for CFCS. Rather, (1) the database identified two different entities and four different addresses, three of which were listed for "CFCS Investments, L.P."; (2) the first address listed in the search results, which is usually the most current address, was still the Brown Address; (3) the Union Address was the third address on the list; and (4) nothing indicated which, if any, of these possible addresses was the current, new address.

---

[6] Accurint searches were conducted on January 6, 2011 and May 20, 2011.

The record shows that from February 2011 through August 2011, Transamerica continued to send notices and other correspondence to CFCS at the Brown Address, even though those notices were being returned as undeliverable. At the same time, Transamerica sent a number of inter-office memoranda to the Rampart Agency ("Rampart"), the general agent for the Policy, and Theodore Beringer, described by CFCS as the "head of MAFG," advising that the Post Office had returned correspondence sent to CFCS and asking if Rampart had a more current address.[7] Transamerica received no response to the memorandum from either Rampart of Beringer, although MAFG denies receiving any Transamerica mail in 2011 and 2012 relating to the Policy – including the 2011 Inter-Office Memos and lapse notice.

CFCS discovered the Policy lapse in 2014 and submitted a reinstatement application on or about August 15, 2014. Transamerica mistakenly advised CFCS that the Policy was no longer eligible for reinstatement. After CFCS disputed Transamerica's position, Transamerica allowed CFCS to submit a reinstatement application, which it did on February 2, 2015. On March 5, 2015, Transamerica declined reinstatement due to Clark's medical history. Clark died on June 13, 2016. Clark's son, Michael H. Clark, the named personal representative of her estate, was substituted as a party plaintiff pursuant to Fed. R. Civ. P. 25(a).

## IV. Discussion

### A. Clark's standing

As a threshold matter, both Transamerica and MAFG challenge Clark's standing to bring this action on the grounds that only the policy owner – CFCS – has any rights under a life insurance policy while the insured is alive, and that after death, the beneficiary – also CFCS –

---

[7] Transamerica also copied Rampart and Beringer on a letter dated February 17, 2011 advising CFCS that the Policy's accumulation value was not sufficient to pay the cost of insurance for the Policy and a letter dated August 16, 2011 advising CFCS that the Policy had lapsed.

has all rights under the policy. The standing issue was previously raised in Defendants' motions to dismiss (Doc. Nos. 12, 34), but because the Court was unable to determine the beneficiary under the Policy,[8] Defendants' motions were denied as to Clark's claims. (Doc. No. 52) On the record now before the Court, it is undisputed that CFCS is the beneficiary under the Policy and, therefore, the only party with standing to bring these claims. The Court thus finds that neither Clark nor her estate have standing and dismisses her claims.

## B. Motions for summary judgment

### 1. CFCS/Transamerica motions

The cross-motions for summary judgment filed by CFCS and Transamerica raise two dispositive issues: (1) whether Transamerica breached its contractual duty to notify CFCS of the Policy's grace period by failing to send notice to the Union Blvd. address or alternatively, by failing to determine and send notice to CFCS's correct address after correspondence was returned as undeliverable; and (2) whether Transamerica breached its duties of care and fiduciary duties to CFCS by continuing to send premium due notices to the Brown Address – an address it knew was no longer valid – allowing the Policy to lapse without notifying CFCS, and refusing to reinstate the Policy. The Court finds these are questions of fact for a jury to resolve by determining whether CFCS notified Transamerica of its change of address and if so, whether Transamerica properly acted upon it.

Ali v. Midland Nat. Life Ins. Co., No. 3:10-CV-00943-PK, 2012 WL 6863193, at *5 (D. Or. Oct. 24, 2012), report and recommendation adopted, No. 3:10-CV-00943-PK, 2013 WL 163295 (D. Or. Jan. 14, 2013), is instructive. In Ali, the insurer, Midland, cancelled a life insurance policy for non-payment of premiums. From 1999 to 2003, Midland sent premium due

---

[8] The application was not submitted with either motion to dismiss.

notices to the insured at 25144 SW Pete's Mountain Road, West Linn, OR, and the insured paid the annual premiums in a timely manner. Id. at *1. In January 2004, Midland processed a request from the insured to change the Policy's mailing address from 25144 SW Pete's Mountain Road, West Linn, OR to P.O. Box 668, West Linn, OR. For the years 2004 through 2009, Midland sent mail for the Policy, including premium due notices, to P.O. Box 668, and the insured paid the premiums in a timely manner. Id.

According to the insured, in late June 2009, it notified Midland in writing of another change of address, from P.O. Box 668 to P.O. Box 121. There was, however, no indication that Midland received, processed, or acted upon the insured's purported June 2009 change of address correspondence. Id. at *2. Six months later, Midland sent the insured a premium due notice for the 2010 Policy year. The notice was returned as undeliverable. The insured failed to make its premium payment by December 28, 2009 when it was due, or by January 29, 2010, the end of the 31-day grace period provided by the Policy. Midland mailed two more notices that the policy had lapsed – one on February 1, 2010 and one on March 10, 2010 – both of which were returned as undeliverable. Id. Midland made no other attempts to notify the insured that the policy had lapsed. Sometime in March 2010, the insured became aware that it had not received a premium due notice. It tendered payment of the 2010 premium but Midland refused to accept it on the grounds that the policy had been cancelled. Id. at *3. The insured then filed suit, alleging claims for breach of contract and a claim seeking a declaratory judgment that the policy was still in effect.

Midland moved for summary judgment on the grounds that: (1) the insured breached the express terms of the contract by failing to pay the annual premium in the required time; and (2) Midland had no duty to send premium due notices to the new P.O. box of which it had no

knowledge, or to make other attempts to contact the insured.[9] Id. at *4. In discussing the effect of sending notice to an invalid address, the court in Ali noted that leading insurance law treatises indicate an insurer is estopped from asserting a policy lapse for non-payment only when the insured fails to receive a premium due notice through no fault of his own. Id. Conversely, an insurer is not estopped from asserting a lapse when the insured is at fault for his own failure to receive the premium due notice. Id. at *5 (citing 5 Couch on Insurance § 71:34 (3rd ed.)). "If an insurer is required to send premium due notices by custom, the insurer must continue to send notices to the address it has on file for the insured unless it is notified that the insured has changed address. However, the fact that the insured has changed his or her address does not affect the sufficiency of the notification, where the change is unknown to the insurer." Id. (internal quotation marks, alterations, and citations omitted). Thus, Midland's compliance with the contract requirement to notify the insured before cancelling the policy depended "crucially" on whether the insured or Midland was at fault for the insured's failure to receive the premium due notice. Id.

Like in Ali, Transamerica's compliance with the Policy requirement to notify CFCS of the grace period depends on who is at fault for CFCS's failure to receive the notice – CFCS or Transamerica. Based on the record before the Court, a question of fact exists as to whether CFCS properly notified Transamerica of its new address and in turn, whether Transamerica properly acted upon it. Accordingly, CFCS's motion for partial summary judgment on its breach of contract and Transamerica's motion for summary judgment will be denied.

### 2. MAFG motion

---

[9] Midland also argued it had no duty to send the insured premium due notices at all, but later conceded that its custom and practice of sending premium due notices created such an obligation. Id. at *4.

CFCS alleges MAFG was negligent in failing to obtain CFCS's correct address; making no effort to determine CFCS's correct address; failing to respond to inquiries from Transamerica regarding CFCS's address; and allowing the Policy to lapse without informing CFCS that the Policy would lapse. MAFG argues it is entitled to summary judgment on CFCS's claims because it procured the Policy as requested and assumed no other duties.

Generally, an insurance broker's duty is to exercise reasonable care, skill and diligence in procuring the requested insurance. State Auto Prop. & Cas. Ins. Co. v. Boardwalk Apartments, L.C., 572 F.3d 511, 515 (8th Cir. 2009); A.G. Edwards & Sons v. Drew, 978 S.W.2d 386, 394–395 (Mo. Ct. App. 1998). However, the nature of that duty may vary depending on the relationship of the parties and any agreements between them. Allstate Indem. Co. v. Dixon, No. 6:14-CV-03489-MDH, 2015 WL 6150586, at *1 (W.D. Mo. Oct. 19, 2015) (citing Emerson Elec. Co. v. Marsh & McLennan Companies, 362 S.W.3d 7, 19-20 (Mo. 2012); Manzella v. Gilbert-Magill Co., 965 S.W.2d 221, 227 (Mo. Ct. App. 1998)); see also Zeff Distributing Co. v. Aetna Cas. & Sur. Co., 389 S.W.2d 789, 795 (Mo. 1965).

MAFG argues that any duty owed to CFCS ended with delivery of the Policy in 1997. There was no written agency agreement or long-standing relationship of trust between the parties that would establish a duty beyond policy delivery, noting that the Policy was the only product CFCS purchased through MAFG; and that after the Policy was delivered in 1997, there was no contact or communications between CFCS and MAFG until 2014, some 17 years later.

CFCS argues the facts of this case impose a duty on MAFG to keep it informed of the status of the Policy. In particular, CFCS points to the fact that MAFG earned over $60,000 in commissions over the life of the Policy, that MAFG and Transamerica were in "repeated contact" with each other over the years about the Policy, and that MAFG had contact information

for CFCS in its files. In addition, the evidence of record demonstrates MAFG was able to monitor whether its clients' premium payments to Transamerica were current and that Transamerica had a history of sending notices of imminent lapse to MAFG.

Plaintiff's expert witness Stephen Burgess opines that the industry standard of care required MAFG, as the servicing agent, to stay informed of the status of the Policy and notify CFCS of premiums due, pre-lapse and lapse, particularly when it knew CFCS was not receiving notices from Transamerica and had contact information for CFCS. MAFG's expert witness Greg Doby opines there is no accepted uniform standard of care within the insurance industry regarding the servicing of clients, including contacting policy holders about pending lapses, lapses, or mail being returned as undeliverable. Given this disputed issue of material fact regarding the standard of care in the servicing of client within the insurance industry, MAFG's motion for summary judgment will be denied.

### C. Daubert motions

The admission of expert testimony in federal court is governed by Federal Rule of Evidence 702. A district court acts as a "gatekeeper" when screening expert testimony for relevance and reliability. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 590-93 (1993); Russell v. Whirlpool Corp., 702 F.3d 450, 456 (8th Cir. 2012). To satisfy the reliability requirement, the party offering the expert testimony "must show by a preponderance of the evidence both that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid." Barrett v. Rhodia, Inc., 606 F.3d 975, 980 (8th Cir. 2010) (quoting Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 757 (8th Cir. 2006)). To satisfy the relevance requirement, the proponent must show that the expert's reasoning or methodology was applied properly to the facts at issue. Id. A court is entitled to substantial

discretion in determining whether expert testimony should be allowed. "There is no single requirement for admissibility as long as the proffer indicates that the expert evidence is reliable and relevant." Russell, 702 F.3d at 456-57 (quotation omitted). "An expert's opinion should be excluded only if that opinion is so fundamentally unsupported that it can offer no assistance to the jury." Synergetics, Inc. v. Hurst, 477 F.3d 949, 956 (8th Cir. 2007) (internal quotation marks and citation omitted); see also Minn. Supply Co. v. Raymond Corp., 472 F.3d 524, 544 (8th Cir. 2006) (quotation omitted). "[D]oubts regarding the usefulness of an expert's testimony" are resolved in favor of admissibility, Marmo, 457 F.3d at 758; accord Johnson v. Mead Johnson & Co., 754 F.3d 557, 562 (8th Cir. 2014), because "[a]n expert's opinion should be excluded only if that opinion is so fundamentally unsupported that it can offer no assistance to the jury, Synergetics, Inc. v. Hurst, 477 F.3d 949, 956 (8th Cir. 2007) (internal quotation marks and citation omitted).

### 1. Stephen Burgess

CFCS has designated Stephen Burgess as its expert to testify regarding the customs and practices of the insurance industry.[10] Both Transamerica and MAFG move to exclude his testimony and opinions. The Court addresses each motion in turn.

### a. Transamerica

In his expert report, Burgess opines that Transamerica fell below the industry standard of care in the following ways:

1. Transamerica fell below a reasonable standard of care by failing to act on information in its possession to properly inform CFCS of outstanding premiums and pending lapse.

---

[10] CFCS states that Burgess' opinion is proffered only with respect to its negligence claim, not its contract claim, since an expert may not testify for the purpose of interpreting contractual provisions or explaining the legal obligations that arise from a contract. (Doc. No. 126 at 2 n.1)

2. Transamerica fell below a reasonable standard of care by not using the address on the May 2010 and July 2010 premium checks it received from CFCS to send notices to CFCS.
3. Transamerica should have reinstated the Policy automatically, without evidence of insurability.
4. Transamerica set a precedent for CFCS to rely on its premium notifications going back to at least 2007.
5. Transamerica should have called agent Beringer, beginning in December 2010, regarding the Policy notices and status.
6. Transamerica has ultimate responsibility to make efforts to allow a policyholder to maintain coverage.
7. Transamerica should have tried to locate the general partners listed on the application, in addition to the general partnership itself.

See Burgess Expert Report, Doc. No. 99-4 at 3-7.

Transamerica first argues that Burgess is not qualified as an expert. Specifically, Transamerica claims that Burgess, an insurance agent, has never worked in-house for an insurer, never written an insurer's internal operating procedures, never worked in an insurer's claims department and never worked in an insurer's customer service department at all, let alone investigating addresses. He has no specialized formal insurance education and lacks expertise in the specific issues in this case, namely address changes and policy lapses. Transamerica also claims that Burgess' opinion on Transamerica's duties to CFCS is inadmissible because it conflicts with the law that the policy owner has a duty to update his address for the insurer and because it is a legal conclusion. Transamerica contends that Burgess' opinion that it should have contacted the Clarks at the address on the policy application because it was the residence address of a family member who could have provided a current mailing address for CFCS, was based on incorrect facts. Burgess testified he had no idea whether the Clarks even lived at the address on the policy application or whether Harold Clark was alive when the Policy lapsed. Furthermore, Michael Clark testified that no family member lived at that address. Therefore, Burgess's

opinion is neither reliable nor relevant.[11] Lastly, Transamerica faults Burgess' opinions based on "IMSA Insurance Marketplace Standards," a set of generic principles relating to "honesty and fairness," "competent and customer-focused sales and service" and ethical conduct as vague and unreliable. Transamerica maintains that Burgess' report, based on his interpretation of the IMSA standards, reflects his own subjective conclusions regarding Transamerica's actions and does not assist the trier of fact.

In response, CFCS asserts that Burgess is both qualified to testify regarding the issues raised and that his report and testimony provide reliable expert testimony. CFCS maintains that fundamentally, Burgess opines there is a standard of care in the insurance industry requiring an insurer with access to a current address for a policy owner to take reasonable steps to contact the owner to give notice of a potential lapse and that Transamerica failed to meet this standard. CFCS relies on Certain Underwriters at Lloyd's v. SSDD, LLC, No. 4:13-CV-193 CAS, 2014 WL 3097284, at *6 (E.D. Mo. July 7, 2014), as well as case law from other jurisdictions, to support its position that Burgess may testify as to the standards of the life insurance industry and render an opinion as to whether Transamerica met that standard. CFCS further responds that the factual bases for Burgess' opinions are undisputed. CFCS specifically notes the Policy language requiring Transamerica to notify the insured that the grace period had begun, as well as the fact that during the grace period, Transamerica knew the address it was using for CFCS – the Brown Address – was incorrect.

An expert may be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702; Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150-51 (1999). Whether a witness is qualified as an expert depends on whether the witness' training and experience

---

[11] CFCS states it does not intend to offer Burgess' opinion on this point, thereby mooting the issue. (Doc. No. 126 at 6 n.2)

demonstrate knowledge of the subject matter. <u>Moran v. Ford Motor Co.</u>, 476 F.2d 289, 291 (8th Cir. 1973). For an expert witness to be qualified based on experience, that experience must bear a close relationship to the expert's opinion. <u>Schmidt v. City of Bella Villa</u>, 557 F.3d 564, 571 (8th Cir. 2009). However, "[a]n expert witness need not be an outstanding practitioner in the field nor have certificates of training in the particular subject." <u>United States v. Rose</u>, 731 F.2d 1337, 1346 (8th Cir. 1984); <u>Fox v. Dannenberg</u>, 906 F.2d 1253, 1256 (8th Cir. 1990).

After consideration, the Court is satisfied that Burgess is qualified to testify based on his knowledge, skill, and twenty plus years of work experience in the insurance industry as a sales manager, regional director and life insurance broker. During his tenure with Penn Mutual Life Insurance Company, Burgess was involved with claims and reinstatement issues. He is also a certified Life & Disability Analyst and an approved insurance instructor by the California Department of Insurance. Any gap in his qualifications or knowledge goes to the weight, rather than the admissibility, of his testimony, <u>American Auto. Ins. Co. v. Omega Flex, Inc.</u>, 783 F.3d 720, 726 (8th Cir. 2015), and may be explored by Defendants on cross-examination, <u>see</u> <u>Minn. Supply Co. v. Raymond Corp.</u>, 472 F.3d 524, 544 (8th Cir. 2006).

Further, an insurance expert may testify, without invading the province of the court or the jury, regarding what duties are owed by an insurance company and whether the actions of the insurance company complied with those duties without offering improper legal conclusions. <u>Camacho v. Nationwide Mut. Ins. Co.</u>, 13 F. Supp.3d 1343, 1366 (N.D. Ga. 2014) (citing cases). Thus, Burgess' opinions, based on insurance industry norms, regarding Transamerica's duty to investigate and then follow up to locate CFCS are not improper legal opinions or conclusions of law.

Transamerica's argument that Burgess' opinion is based on speculation is a challenge to the factual basis of his testimony. "The factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." Nebraska Plastics, Inc. v. Holland Colors Americas, Inc., 408 F.3d 410, 416 (8th Cir. 2005) (quoted case omitted).

**b. MAFG**

With respect to MAFG, Burgess opines that:

1. The industry standard of care requires MAFG, as the servicing agent, to stay informed of the status of the policy and to inform the owner when the policy is at risk of lapsing. MAFG's role in the Policy was clear and it had a duty, under the industry standard of care, to insure it obtained timely status of the Policy.
2. MAFG fell below a reasonable standard of care in the life insurance industry.
3. Had MAFG met its duty under the industry standard of care, the Policy would not have lapsed.

See Burgess Expert Report at 7.

MAFG seeks to exclude Burgess's report and testimony on the grounds that he has failed to provide a foundation for his opinions as to MAFG. There is no reference to industry regulation, authoritative guidelines, contracts, or other insurance industry materials in support of his opinions, especially in defining the applicable standard of care. MAFG further argues that Burgess fails to demonstrate how his general insurance experience supports his opinions, or how the generic IMSA standards apply to an independent broker like MAFG. Alternatively, MAFG argues that Burgess should be prohibited from using the term "ethical" in relation to MAFG's duties and obligations, as this is the incorrect standard of care.

In response, CFCS asserts that Burgess is qualified to testify regarding the insurance broker industry and that his opinions are reliable and based upon the fundamental facts of the

case, as set out in his expert report. In addition, CFCS argues that Burgess' testimony is based in part on a standard of ethics that Transamerica chose to adopt.

After consideration, the Court is satisfied that Burgess is qualified to testify based on his knowledge, skill, and twenty plus years of work experience in the insurance industry. Again, the factual basis of an expert opinion goes to the credibility of the testimony. It will be up to MAFG to examine the factual basis for Burgess' opinion on cross-examination. Nebraska Plastics, 408 F.3d at 416. With respect to Burgess' references to MAFG's "ethical" duties, responsibilities, obligations, and treatment of CFCS, however, the Court will exclude that testimony. The term "ethical" as it relates to a moral obligation is not relevant to this case.

### 2. Burke Christensen

Transamerica has designated Burke Christensen as its expert in this matter. In the first section of his report, Christensen provides an analysis of Burgess' opinions. He maintains that Burgess is wrong in his assertion that an insurer has a duty to contact the insured to prevent the lapse of an insurance policy and faults Burgess for offering no citation to the source of the "minimum standards" which, in his opinion, Transamerica did not meet. Christensen refutes Burgess' opinions on purported industry standards concerning the mailing of premium notices and reinstatement applications as well as the timing of the Policy's grace period. (See Report, Doc. No. 108-1 at 2-4). The second section of Christensen's report contains an analysis of the case and insurance industry standards. He sets out certain key principles about insurance relevant to the case, including that an insurance policy is a "unilateral conditional contract"; the duty to pay premiums is "a fundamental requirement of all forms of insurance"; payment of premiums is "not conditioned upon whether the insurer sends the policy owner a premium notice"; and it is the policy owner's duty to give notice of a change in address. (Id. at 4-8) In the third and final

section of his report, Christensen opines that "[t]he steps taken by Transamerica [to locate CFCS' correct address] were consistent with the standard kind of steps taken by insurers who are seeking to find policy owners who have failed to provide a current address." (Id. at 9)

CFCS does not challenge Christensen's qualifications, experience or methodology. Rather, CFCS seeks to exclude his testimony and opinions on the grounds that they are based on improper legal conclusions. CFCS claims that Christensen repeatedly opines on what the terms of the Policy required of Transamerica and/or CFCS, what contractual duties were owed under the Policy, and whether or not Transamerica and/or CFCS acted in accordance with the Policy. CFCS argues it is improper for an expert to interpret or construe a contract or testify that a party has a duty under a contract, citing CitiMortgage, Inc. v. Equity Bank, N.A., No. 4:15-CV-230 SPM, 2017 WL 3581590, at *2 (E.D. Mo. Aug. 18, 2017) and Rayburn v. Lezgi Motors, Inc., No. 4:12-CV-1410 CEJ, 2014 WL 2642111, at *3 (E.D. Mo. June 13, 2014).

Transamerica responds that Christensen's opinions are proper under Rule 702. Any "duty" referred to in his opinions is based on insurance industry standards and practices and not on an interpretation of the Policy terms or any statute, regulation or other laws. Moreover, he does not come to any conclusions as to whether Transamerica breached the terms of the life insurance policy at issue or whether any party was negligent, nor does he tell the jury what result should be reached.

The Court agrees. "An expert may testify that factual circumstances demonstrate that a person did not meet a legal duty that is otherwise defined by the court." Travelers Indem. Co. of Am. v. Holtman Properties, L.L.C., No. 4:08-CV-351 CAS, 2009 WL 995464, at *6–7 (E.D. Mo. Apr. 14, 2009) (quoting United States v. Hawley, 562 F. Supp. 2d 1017, 1041 (N.D. Iowa

2008)). Accordingly, the Court will deny CFCS' motion to exclude Christensen's report and testimony.

### 3. Greg Doby

MAFG has designated Greg Doby as its expert to counter Burgess' opinions relating to MAFG. Specifically, Doby opines there is no uniform industry standard, regulation or policy mandating that insurance agents or brokers advise a policyholder of a pending policy lapse or lapse:

1. There is no set or accepted uniform standard of care in the servicing of clients in the insurance industry. Specifically, there is no universal practice within the industry regarding agent's contacting policyholders about pending lapses, lapses or mail being returned as undeliverable.
2. There is no state regulation delineating General Agent or Agent responsibilities about servicing clients.
3. There was no special relationship, or agreement requiring a higher level of service between the policy owner and the General Agent or Agent.
4. An industry wide insurance company corporate policy requiring General Agents or Agents servicing requirements does not exist.
5. The insurance industry practice regarding communicating with a General Agency or Agent varies by company.
6. There is no evidence that MAFG Services received the "Inter Office Memos" about CFCS Investment's pending lapse or lapse between 2010 and 2014. However, even if MAFG Services did receive the communications, there was no regulation or industry wide practice requiring it to contact the policy owner.
7. It is an industry standard that the insurance policy is a contract between the insurance company and the policyholder, the General Agent or Agent is not part of the contract.
8. I believe MAFG Services acted ethically.

See Report, Doc. No. 105-1 at 4.

CFCS argues that Doby is not qualified to opine on the standards of care for insurance brokers or agents because he has worked for insurers only and has no practical experience as a broker or agent. CFCS also argues that Doby has never published a paper, taught classes, or provided expert testimony about the standard of care for agents or brokers. MAFG responds that Doby is sufficiently qualified to testify as an expert in this case based on his significant work

experience, including eight years as an insurance agent selling life insurance policies and thirty-seven years supervising and training insurance agents and brokers, as well as his review of the evidence in this case.

As discussed above, a witness may be qualified as an expert if his training and experience demonstrate knowledge of the subject matter, Moran, 476 F.2d at 291, and bear a close relationship to his opinion, Schmidt, 557 F.3d at 571. An expert need not be "an outstanding practitioner in the field nor have certificates of training in the particular subject." Rose, 731 F.2d at 1346. After consideration, the Court is satisfied that Doby is qualified to testify based on his forty years in the life insurance industry, which included supervision and training of both agents and brokers. The fact that he does not have a current insurance agent's license does not render his testimony inadmissible; any gap in his qualifications or knowledge goes to the weight, rather than the admissibility, of his testimony and may be explored on cross-examination. American Auto., 783 F.3d at 726; Minn. Supply, 472 F.3d at 544. The Court will however, exclude Doby's opinion that MAFG acted "ethically" because, as discussed above, MAFG's "ethical" obligations are not relevant to this case.

For these reasons,

**IT IS HEREBY ORDERED** that the claims of Plaintiff Michael H. Clark, Personal Representative of the Estate of Jewell A. Clark, are **DISMISSED** for lack of standing.

**IT IS FURTHER ORDERED** that Transamerica Life Insurance Company's Motion for Summary Judgment or, in the alternative, Partial Summary Judgment [91] is **DENIED.**

**IT IS FURTHER ORDERED** that Transamerica Life Insurance Company's Motion to Disqualify or, in the alternative, to Bar Opinions of Plaintiff's Proffered Expert [97] is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff C.F.C.S. Investments, LP's Motion for Summary Judgment on Count II of Plaintiff's Second Amended Complaint [101] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff C.F.C.S. Investments, LP's Motion to Strike and Exclude Expert Testimony of Gregory Doby [104] is **GRANTED** in part in accordance with the rulings herein.

**IT IS FURTHER ORDERED** that Plaintiff C.F.C.S. Investments, LP's Motion to Strike and Exclude Expert Testimony of Burke Christensen [107] is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant MAFG Services, Inc.'s Motion for Summary Judgment or, in the alternative, Partial Summary Judgment [109] is **DENIED.**

**IT IS FINALLY ORDERED** that Defendant MAFG Services, Inc.'s Motion to Bar Testimony and Opinions of Plaintiffs' Proffered Expert Stephen C. Burgess [112] is **GRANTED** in part in accordance with the rulings herein.

This case remains set for trial on **September 10, 2018.**

Dated this 15th day of August, 2018.

_John A. Ross_

**JOHN A. ROSS**
**UNITED STATES DISTRICT JUDGE**